**Lee Otis JOHNSON, Petitioner,**

v.

**Dr. George J. BETO, Director, Texas Department of Corrections, and L. G. Bounds, Warden, Coffield Unit, Texas Department of Corrections, Respondents.**

**Civ. A. No. 71–H–909.**

United States District Court,
S. D. Texas,
Houston Division.

Jan. 19, 1972.

William F. Walsh, Charles A. Keilin, Bobby H. Caldwell, Bennett Stokes, Arthur J. Mandell, Houston, Tex., for petitioner.

Joe S. Moss, Asst. Harris County Dist. Atty., Houston, Tex., Crawford C. Martin, Atty. Gen. of Texas, Robert C. Flowers, Lonny F. Zwiener, Asst. Attys. Gen., Austin, Tex., for respondents.

## MEMORANDUM AND ORDER

CARL O. BUE, Jr., District Judge.

Petitioner, a prisoner in state custody, has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. §§ 2241, 2254.

On August 26, 1968, petitioner was tried before a jury for the offenses of possession and unlawful sale of marijuana. He was convicted only of the second offense, the unlawful sale or gift of one marijuana cigarette to a police undercover agent, and sentenced to thirty years confinement in the Texas Department of Corrections on August 27, 1968. The conviction was affirmed in Johnson v. State, 447 S.W.2d 927 (Tex.Crim.App.1970). Petitioner thereupon sought relief in the nature of an application for the writ of habeas corpus from the convicting court and later from the Court of Criminal Appeals, but without success in each instance. This Court has jurisdiction pursuant to 28 U.S.C. §§ 2241, 2254.

Petitioner challenges his state conviction on the basis of four alleged constitutional deprivations. He complains of a denial of due process of law owing to the fact that:

(1) He was improperly denied a change of venue and was put to trial in a county where prejudice was so great that he was denied a fair trial;

(2) He was unable to properly establish local prejudice because of the voir dire examination procedure of prospective jurors and so was denied the effective assistance of counsel;

(3) He was denied compulsory process for two witnesses; and

(4) He was subjected to cruel and unusual punishment since the sentence of thirty years was unduly excessive.

On January 4, 1972, an evidentiary hearing was held which was limited to the exploration of facts surrounding the claim of petitioner that he was denied due process of law by being put to trial in a county where prejudice was so great that he was denied a fair trial including any proof that local public officials conspired against petitioner. However, subsequent oral argument of counsel related to the state court record as well and was leveled at all of petitioner's contentions.

The facts necessary for decision will be briefly summarized from the proof adduced at the evidentiary hearing as well as from the evidence contained in the state court record. In 1967 and 1968, petitioner, a Negro, was the Houston and Harris County area representative for the Student Non-Violent Coordinating Committee (SNCC). In this position he was involved in many racially oriented activities such as the making of speeches, confrontations with public officials, and the participation in various demonstrations. In short, he came to be regarded by many public officials and citizens of Harris County, Texas as one of the most vocal and demanding of the black militants in the community. More specifically, during part of this time he was a student at Texas Southern University (TSU), which is located in Houston. He was suspended from this school in early 1967 because of certain racial demonstrations on campus. On May 16, 1967, a race riot occurred on the campus of TSU, and a Houston police officer was killed. Five TSU students were subsequently indicted on charges of assault with intent to murder. Petitioner was not so indicted, since at the time of the riot he was in the county jail charged with unlawful assembly as a result of a race related demonstration at a local junior high school. Nevertheless, petitioner's name was closely associated with various racially tinged speeches and demonstrations at

TSU as well as the May 16 riot in view of his connection with SNCC. Subsequently, petitioner was involved in numerous other demonstrations, most of which were covered by the news media.

On November 2, 1967, the local news media reported that the SNCC was the cause of the TSU riot and that petitioner in that regard was "a hard-core SNCC militant". On the same day a U. S. Senate Committee investigation headed by Senator John McClellan was reported as attributing the cause of the riot to the SNCC. On November 26, 1967, petitioner was freely reported by the news media as advocating a revolution to remedy the local racial problems. On March 1, 1968, the District Attorney for Harris County and the Houston Bar Association in an unprecedented move filed a motion in the state court, where the five TSU students were to be tried as a result of the police officer's death, requesting that a hearing be held to decide whether there should be a change of venue because of the intense publicity and news media coverage of the case. A hearing was held on April 4, 1968, and on April 29, 1968, the trial judge ordered that the case be transferred out of Harris County.

During the time between the change of venue hearing and the actual trial of the five students, petitioner was indicted on April 16, 1968, for the offense involved herein and tried in Harris County four months later. On August 22, 1968, four days before the trial, petitioner sought to subpoena as witnesses the Houston Mayor and Chief of Police. The subpoenaes were returned unexecuted for the reason that these witnesses were out of town. Petitioner moved for a continuance on the grounds that these witnesses were essential to his defense. Petitioner asserted that these witnesses were material to the motion for change of venue, since Texas law permits a change of venue when it is established that there is a dangerous combination of influential persons against the accused. It was also alleged that these witnesses were material to petitioner's defense of entrapment at the actual trial. The motion was denied because it was not timely filed and because the witnesses were not material to the trial. Shortly thereafter, petitioner filed a motion for change of venue, alleging that there was community prejudice resulting from publicity given to petitioner's activities in Houston during the months immediately prior to trial. On August 26, 1968, the trial court conducted a hearing on this motion. Four witnesses appeared, two for petitioner and two for the State. The motion was denied after two reporters for the local news media testified that petitioner could get a fair trial in Harris County. One reporter stated that: "There has been . . . probably less and less publicity or attention to him [petitioner] in radio and television news stories since the TSU matter." Transcript, at 182.

The case then proceeded to trial on the same date. Petitioner moved for individual voir dire of the jury panel out of the presence of the remainder of the panel. The motion was denied. During the group voir dire of the jury panel nine prospective jurors recognized petitioner's name. At the end of the voir dire, petitioner unsuccessfully moved for additional peremptory challenges in order to strike the jury panel members who had heard his name. Petitioner next filed a motion to quash the entire jury panel on the basis that they had been improperly qualified. The motion was denied. Petitioner then filed a second motion for change of venue but to no avail; again the motion was denied. The State then put on its evidence against petitioner, and he was found guilty of count two of the indictment, the unlawful sale or gift of marijuana, based upon the testimony of a police undercover agent. Thereafter, at the hearing on punishment the jury, upon presentation of evidence that he had been convicted previously of auto theft and that he had a bad reputation in the community, retired to the jury room and deliberated 37 minutes, returning to assess petitioner's punishment at thirty

years confinement in the state penitentiary. Petitioner filed a motion for new trial, and a hearing was held on this motion. At this hearing the Houston Mayor and Chief of Police briefly testified that they had not conspired against petitioner. However, they were not permitted to testify, after the State objected, as to the publicity surrounding the TSU riot and its impact on the community.

It is obvious that petitioner received extensive news coverage from his various racially oriented activities for some time prior to trial. In fact, it is evident from the exhibits contained in the state court record that petitioner's name appeared either in one or the other of the two major Houston newspapers 44 times during an 18 month period prior to trial. It also appears that a number of these newsworthy items were reported by the radio and television media. In this connection it is beneficial here to expand upon some of petitioner's activities in the news as they were described at the evidentiary hearing. In April of 1968, petitioner solidified his unfavorable image as a black militant at a memorial service held in a local park for Martin Luther King which was attended by the Houston Mayor and which received broad news media coverage. Also in April petitioner appeared as a member of a panel on a local educational television program and created a most adverse impression of himself, as a participant, abruptly leaving the program at one point only to return after the entreaties of other panelists. In June of 1968, petitioner was arrested for disturbing the peace while engaged in further racial disturbances. In July of 1968 petitioner appeared before Houston City Council alleging that he and his wife had been mistreated by Houston police officers. As a consequence of these events petitioner continued to receive frequent news coverage. However, apart from such publicity, the extent of his influence among the Negro community at that time was as controversial as his varied activities, some viewing it as significant, whereas others saw his influence as minimal.

Turning to the constitutional law aspects of this case in conjunction with petitioner's first contention that he was put to trial in a prejudiced community, it is well established that:

[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, "indifferent" jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. "A fair trial in a fair tribunal is a basic requirement of due process." In the ultimate analysis, only the jury can strip a man of his liberty or his life. In the language of Lord Coke, a juror must be as "indifferent as he stands unsworne." His verdict must be based upon the evidence developed at the trial. This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies.

Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961) (citations omitted). Accordingly, due process requirements of the Fourteenth Amendment dictate that the accused must "receive a trial by an impartial jury free from outside influences." Sheppard v. Maxwell, 384 U.S. 333, 362, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966).

Generally, in order to establish a denial of due process, there must be a nexus shown between the community prejudice and the alleged jury prejudice. Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). However, in Beck v. Washington, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962), it was impliedly recognized that the element of pretrial publicity could be so intensive and extensive that the Court would be required to find prejudice as a matter of law. Shortly thereafter it was openly acknowledged in several cases that if there has been "inherently prejudicial publicity" prior to trial, an actual nexus

need not be shown. *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *see* Hale v. United States, 435 F.2d 737 (5th Cir. 1970). The subjective line of distinction thus emerged:

> While the Supreme Court has reversed convictions without a showing of jury prejudice in extreme cases because of "inherently prejudicial publicity which saturated the community," we are in accord with the view that where publicity prior to and during a trial is neither inherently prejudicial nor unusually extensive, the accused must assume the traditional burden and show actual jury prejudice.

Gordon v. United States, 438 F.2d 858, 874 (5th Cir.), cert. denied, 404 U.S. 828, 92 S.Ct. 139, 30 L.Ed.2d 56 (1971).

In Pamplin v. Mason, 364 F.2d 1 (5th Cir. 1966), the District Court granted the writ of habeas corpus upon finding that from a view of "the totality of the surrounding facts," the state court's denial of a change of venue created the possibility of the denial of a fair and impartial trial. The Court of Appeals, in affirming, indicated that the proper test to be employed was:

> Where outside influences affecting the community's climate of opinion as to a defendant are inherently suspect, the resulting probability of unfairness requires suitable procedural safeguards, such as a change of venue, to assure a fair and impartial trial.

*Id.* at 5. The Court went on to elaborate upon the application of this test to the facts involved:

> Where racial feeling may be strong, the voir dire, let alone group examination to which this defendant was restricted, can hardly be expected to reveal the shades of prejudice that may influence a verdict. Due process of law requires a trial before a jury drawn from a community of people free from inherently suspect circum-

stances of racial prejudice against a particular defendant.

*Id.* at 7.

The determination of whether or not an accused is faced with such prejudice from outside publicity that the question of a fair trial is in issue is traditionally best made by the trial judge, since the impact of publicity at a given time in the past is usually most accurately assessed at the trial level. Accordingly, the suspected circumstances contributing to a community's climate of opinion must be strong indeed before this Court's inquiry is appropriate. However, when the accused's proffer of facts on appeal or by petition for writ of habeas corpus creates significant doubt as to whether or not he was deprived of due process of law, an independent review of the facts is both appropriate and necessary. *See* Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Hale v. United States, 435 F.2d 737, 746 (5th Cir. 1970). In such an independent appraisal of the facts, there are unfortunately no recognized rules of general application which have been formulated to aid the courts in making such a determination, since the impact of pretrial publicity necessarily depends upon the circumstances of each case.

No reported opinion appears to possess ingredients which are closely akin to the present circumstances. However, several criteria have been delineated by various courts which are helpful in making such a determination. First, the notoriety of the accused or the facts involved in the case are appropriate considerations. *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Second, the substance of the publicity or, in other words, whether the publicity was a mere "report" or was prejudicial and misleading is important. *Beck v. Washington,* 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962). Third, the massiveness and pervasiveness of the news coverage is relevant. *Sheppard v.*

Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Fourth, the time lapse between the publicity and the trial is an appropriate consideration, since time frequently erodes prejudicial effect. United States v. Tropiano, 418 F.2d 1069, 1079 (2d Cir. 1969), cert. denied, 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530 (1970). *See* Beck v. Washington, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962); Bostick v. United States, 400 F.2d 449 (5th Cir. 1968), cert. denied, 393 U.S. 1068, 89 S.Ct. 725, 21 L.Ed.2d 712 (1969); United States v. Bowe, 360 F.2d 1 (2d Cir.), cert. denied, 385 U.S. 961, 87 S.Ct. 401, 17 L.Ed.2d 306 (1966). Fifth, the size of the relevant community is to be considered. Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). Sixth, whether or not members of the jury panel have heard of the accused is a salient factor. Hale v. United States, 435 F.2d 737 (5th Cir. 1970). Seventh, whether or not the accused found it necessary to challenge members of the jury panel for cause is material. Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); Beck v. Washington, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962); Hale v. United States, 435 F.2d 737 (5th Cir. 1970); Overton v. United States, 403 F.2d 444 (5th Cir. 1968).

After a determination is made that a jury is likely to be threatened by the influences of prejudicial publicity, there are several methods which can be employed to remedy the situation:

> One way to try to meet the problem is to grant a continuance of the trial in the hope that in the course of time the fires of prejudice will cool. . . . Another way is to provide a method of jury qualification that will promote, through the exercise of challenges to the venire—peremptory and for cause—the exclusion of prospective jurors infected with the prejudice of the community from which they come. But this protection . . . is not always adequate to effectuate the constitutional guarantee.

On at least one occasion this Court has explicitly held that only a change of venue was constitutionally sufficient to assure the kind of impartial jury that is guaranteed by the Fourteenth Amendment.

Groppi v. Wisconsin, 400 U.S. 505, 510, 91 S.Ct. 490, 493, 27 L.Ed.2d 57 (1971). *See* Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

■ Viewing the totality of the circumstances surrounding petitioner's trial in terms of the aforementioned constitutional setting, both as gleaned from the state court record as well as from the proof forthcoming at the evidentiary hearing, this Court can only conclude that the outside influences affecting the community's climate of opinion as to petitioner were so inherently suspect as to create a resulting probability of unfairness. The evidence presented at the evidentiary hearing particularly dictates that this conclusion be reached. However, there was no evidence presented at the hearing to substantiate petitioner's allegation that there was a combination of influential persons against him at the time of the trial.

At this hearing various local public officials who were intimately familiar with the community's climate of opinion at the time of the trial testified with commendable candor and forthrightness. Harry Patterson, who was president of the Houston Bar Association at the time of petitioner's trial, testified that in connection with the assault to murder trial of the five TSU students the Houston Bar Association had requested that a hearing be held to determine if venue in this pending trial should be changed. He felt that any black militant connected with the TSU riot could not get a fair trial in Houston at that time. This was in April of 1968. Petitioner was tried in August of 1968. At the time of petitioner's trial the five TSU students had not yet been tried. Louie Welch, the Mayor of the City of Houston, testified that some demonstrations were held as a

result of and at the time of petitioner's trial. The Mayor felt that many of petitioner's speeches in the months prior to his trial were highly inflammatory to numerous white citizens of Houston. Carol Vance, the District Attorney of Harris County, testified that petitioner had the reputation in the community as a dangerous black militant and that petitioner's name was associated with the TSU riot as much as any other person. He also indicated that the community's feeling ran high over the TSU riot and that this incident and the resulting indictments of the five TSU students received as much publicity as any other case he knew of at the time. According to this witness, the assault to murder trial of the five TSU students was the first criminal trial to his knowledge in which the Houston Bar Association had ever participated in requesting a hearing on a change of venue because of possible prejudice to the accused. Herman Short, the Chief of Police, testified that petitioner was regarded by the police department as a black militant and that he had discussed the investigation of petitioner's activities with various members of the police department. Lt. M. L. Singleton, head of the Intelligence Division of the Houston Police Department, testified that his office maintained a file on petitioner as a result of his radical and black militant activities. He indicated that petitioner was viewed as a potentially dangerous black militant, and it was in this regard that he had a bad reputation in the community.

This combined testimony, when viewed in connection with the death of the police officer at TSU and petitioner's various black militant activities over many months thereafter, necessarily indicate that at the time of trial in late August, 1968, the climate in Houston had not changed substantially since the TSU riot. Many of these events were unquestionably fresh in the minds of the people in the community at the time of the trial. Thus, what emerges from the evidence in this case which is not to be found in the other reported opinions is a firsthand detailed assessment of the climate of the community before and at the time of the trial by those in the best position to know these facts. The inescapable conclusion to be reached is that the climate was inherently suspect for trying petitioner in Harris County, Texas on this charge or any other at that time.

The unduly severe sentence which petitioner received is also indicative that outside influences were playing a role in the minds of the jury. The jury assessed a penalty of 30 years confinement for the gift[1] of one marijuana cigarette to a police undercover agent. The respondent apparently concedes that this is an unusually severe penalty for the offense involved. The Houston Mayor openly testified that he was shocked at its severity. It is worthy of note that Texas courts acknowledge that the severity of a sentence may be indicative of prejudice against a defendant. *See* Cox v. State, 90 Tex.Cr.R. 106, 234 S.W. 72 (1921); Barnes v. State, 42 Tex.Cr. R. 297, 59 S.W. 882 (1900); *see also* Pamplin v. Mason, 364 F.2d 1, 6 (5th Cir. 1966). Such a sentence is certainly another appropriate criterion to weigh among the totality of circumstances when attempting to assess the community's climate of opinion at the time of the trial.

This Court having concluded that outside influences at the time of petitioner's trial were inherently suspect, it is obvious that the procedures followed by the trial court could not serve to alleviate their potentially prejudicial effects. The trial court denied petitioner's motion for a continuance. Also denied was a motion for additional peremptory challenges to strike all members of the jury panel who had heard of petitioner. The motion to examine the members of the panel who had recognized petitioner's name individually and out of the presence of the remainder of the panel was denied. The motion to quash the entire

---

1. Under Texas law a "sale" of marijuana is defined to include a "gift". Tex.Penal Code Ann. art. 725b, § 1(10) (1961).

jury panel was denied. And finally, the motion for a change of venue was denied. It is unlikely that the trial court in considering the evidence presented to it as contained in the record ever recognized the degree of hostility toward petitioner which had apparently permeated the community by that time; otherwise, it would have undoubtedly employed one or more of the recognized safeguards to insure a fair trial free from the effects of racial prejudice.

■ Petitioner's related contention that because of the voir dire procedure of prospective jurors employed by the trial court he was unable to establish local prejudice and so was denied effective assistance of counsel also possesses some merit; however, it is not because petitioner was denied the effective assistance of counsel. Petitioner was not permitted individually, and out of the presence of the remainder of the panel, to question on voir dire the jury panel members who had recognized his name. Considering the circumstances of this case, this voir dire procedure is more appropriately characterized as a denial of due process of law to petitioner by depriving him of a reasonable opportunity to obtain an impartial jury and a fair trial. *See* Pamplin v. Mason, 364 F.2d 1 (5th Cir. 1966); Gordon v. United States, 438 F.2d 858 (5th Cir.), cert. denied, 404 U.S. 828, 92 S.Ct. 139, 30 L.Ed.2d 56 (1971); Patriarca v. United States, 402 F.2d 314 (1st Cir. 1968), cert. denied, 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969).

■■ Petitioner's contention that he was denied compulsory process for two witnesses, thereby depriving him of due process of law, is not appropriate for consideration before this Court. Petitioner did not present this contention to the Texas courts on appeal of his conviction. Such an intentional by-pass of the established state procedures which are designed to correct trial errors constitutes a waiver of the claim. Habeas corpus procedure cannot be employed as a substitute for appeal. *See* Fay v. Noia,

372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); Brinlee v. White, 401 F.2d 763 (5th Cir. 1968); Becker v. Beto, 391 F.2d 904 (5th Cir. 1968); Nash v. United States, 342 F.2d 366 (5th Cir. 1965).

■ Petitioner's final contention is that the sentence of thirty years constitutes cruel and unusual punishment. The length of the sentence, standing alone, raises no constitutional issue for determination by this Court, although the severity of the sentence may be evidence of prejudice in the community. The Texas statute prescribes a range of punishment for the offense of selling marijuana. Petitioner's sentence is within that statutory range. Rener v. Beto, 447 F.2d 20 (5th Cir. 1971); United States v. White, 447 F.2d 493 (5th Cir. 1971); Castle v. United States, 399 F.2d 642 (5th Cir. 1968); Rogers v. United States, 304 F.2d 520 (5th Cir. 1962). If the provisions of the statute are to be changed, it is for the legislature of the State of Texas to do so.

Upon review of all of petitioner's contentions, it is apparent that the critical issue to be decided is whether or not Lee Otis Johnson was accorded a fair trial in view of the climate of the community prevailing in Houston, Texas on August 26, 1968. Such review in no way passes upon the guilt or innocence of petitioner of the charges brought against him for the sale or gift of marijuana, nor does it examine the propriety or impropriety of his highly controversial activities as a Negro militant. For the reasons heretofore set forth, it is the conclusion of this Court that there were constitutional errors in petitioner's original trial and that a new trial is now constitutionally dictated. The case is therefore remanded to the state court. The writ of habeas corpus will be granted to the extent that if petitioner is not retried, either in Harris County, Texas, or elsewhere, in a manner consistent with this Memorandum and Order within ninety (90) days after the judgment of this Court becomes final, the peti-

tioner shall then be entitled to his release from state custody.

The foregoing constitute the Court's Findings of Fact and Conclusions of Law.